OPINION
The present appeal results from a declaratory judgment action filed by Miami Valley Child Development Centers, Inc. (MVCDC) against District 925/Service Employees International Union/AFL-CIO (District 925). MVCDC is a 501(C)(3) tax exempt organization and operates 60 Head Start centers in Montgomery, Clark, and Madison Counties. The centers serve about 4,091 children.
In August, 1999, District 925 (a labor union) asked MVCDC to release a list of employee names and addresses. However, MVCDC refused, and filed the present declaratory judgment action, claiming that the records were not subject to disclosure under the Public Records Act. The case was subsequently referred to a magistrate, who found that MVCDC was not a public office and was not subject to the Public Records Act. In particular, the magistrate relied on a finding that MVCDC did not perform a governmental function.
After District 925 objected to the magistrate's decision, the trial judge overruled the objections in part and sustained them in part. Although the court did not agree with all the positions advocated by District 925, it did find that MVCDC fit within the definition of a public office. As a result, the court ordered MVCDC to disclose the names and addresses of its employees. The court also ordered MVCDC to pay the costs of the action. After obtaining a stay of the decision, MVCDC appealed to our court, raising the following assignments of error:
 I. The trial court erred in determining that Miami Valley Child Development Center is a "public office" as defined by R.C. Section 149.011(A).
 II. The trial court erred in determining that the names and addresses of Miami Valley Child Development Center Employees constitute records subject to disclosure under the Public Records Act.
After reviewing the record and the applicable law, we find that the second assignment of error has merit, in part. Accordingly, the judgment of the trial court will be affirmed in part, reversed in part, and modified as to the records being disclosed.
 I
The primary issue in this case is whether a private, not-for-profit Head Start grantee is a "public office" for purposes of Ohio's Public Records Act, R.C. 149.43. Under this statute, public offices must release public records upon request. A public record is defined as "any record that is kept by any public office, including, but not limited to, state, county, city, village, township, and school district units." R.C.149.43(A)(1). A public office is defined for purposes of the Public Records Act as:
 any state agency, public institution, political subdivision, or any other organized body, office, agency, institution, or entity established by the laws of this state for the exercise of any function of government.
R.C. 149.011(A).
The Ohio Supreme Court has considered the meaning of "public institution" and "public office" on several occasions. For example, in State ex rel. Fox v. Cuyahoga Cty. Hosp. System (1988), 39 Ohio St.3d 108, the court considered whether a county hospital was a "public institution" for purposes of R.C. 149.011(A). Relying on Halaby v. Bd. of Directors of Univ. of Cincinnati (1954), 162 Ohio St. 290, the court held that "an entity organized for rendering service to the residents of its community and supported by public taxation is deemed a public institution."39 Ohio St.3d at 110. Because the hospital fit these criteria, the court found that it was a public institution. In turn, the hospital's status as a public institution meant it was a "public office" for purposes of the Public Records Act, i.e., R.C. 149.43.
Fox involved a public hospital operated by the county. In contrast, another case decided the same year involved a public hospital operated by a nonprofit corporation. State ex rel. Fostoria Daily Review Co. v. Fostoria Hosp. Assn. (1988), 40 Ohio St.3d 10. The corporation in Fostoria was not directly supported by tax money. However, it was indirectly supported because it did not pay rent to the city for the hospital building. Specifically, the city built the hospital, and then financed improvements by issuing bonds that were repaid with tax money. Based on Fox, and the fact that rent-free use of the hospital constituted support by public taxation, the Ohio Supreme Court found that the hospital was a public institution. Id. at 12.
Subsequently, in State ex rel. Toledo Blade Co. v. Univ. of Toledo Found. (1992), 65 Ohio St.3d 258, the court held that a private, nonprofit foundation which acted as a fund-raising arm of the University of Toledo was a "public office." Unlike the institutions in the prior two cases, the foundation in Toledo Blade employed its own staff, paid its own rent, and was supported by private donations. However, the court relied on the foundation's connection to predecessor entities that had received support from public taxation. Id. at 262. The court also focused on the foundation's unchanged essential purpose and relationship with the University, the University's continued payment of state retirement benefits for some employees, and the continued transfer of bequests from the University to the foundation. Id. As a result, the court once more found the records subject to release under the Public Records Act.
In State ex rel. Strothers v. Wertheim (1997), 80 Ohio St.3d 155, the Ohio Supreme Court again considered the status of a private, nonprofit corporation. The corporation in that case operated an ombudsman office, which was established to help citizens resolve complaints against county agencies. The office was also supported by public funds. Id. at 155-56. Relying on Fox and Fostoria, the court held that the ombudsman office was a public office. In doing so, the court stressed that "R.C.149.43 must be construed liberally in favor of broad access." Id. at 156.
Three justices dissented in Wertheim, however. One was Chief Justice Moyer, who had written the lead opinion in Fox. According to Chief Justice Moyer, the Wertheim majority had improperly focused on the ombudsman office's "partnership" with the county commissioners and the presence of "some" public funding. Id. at 162. In this regard, he stressed that the court's prior decisions were not intended to establish a per se rule of disclosure. Id. at 159. After reviewing the facts of the case, he concluded that the ombudsman office was not public, because 1) it did not exercise any government function; 2) it was not controlled by the county government to the extent generally required; 3) the office did not perform duties that were historically fulfilled by public institutions or entities exercising government functions; 4) the office also received money from other funding sources; and 5) no public entity had delegated its duties to the office. Id. at 160-61.
The other two dissenting justices felt the majority had improperly interpreted the statutory language in R.C. 149.011(A) by omitting the requirement that the entity be "established by the laws of this state for the exercise of any function of government." Id. at 162-63 (Cook and Lundberg Stratton, dissenting). Based on this statutory language, the dissenting justices felt that the entity in question had to be created by statute. As an example, the county hospital in Fox was established by statute, i.e., R.C. 339.03 and 339.06. 80 Ohio St.3d at 163. Because the ombudsman office in Wertheim was not created by statute for the exercise of any function of government, Justices Cook and Lundberg Stratton felt that it could not be considered a public office. They also agreed with Justice Moyer that the proof was insufficient, even under a relaxed statutory interpretation, to establish that the office was public. Id. at 163.
The next decision of the Ohio Supreme Court involved a private, non-profit corporation that was created to provide a fire-fighting organization for several townships. State ex rel. Freedom Communications, Inc. v. Elida Community Fire Co. (1998), 82 Ohio St.3d 578. In a per curiam decision, the court rejected the corporation's claim that it was not a public office because it "did not perform any function of government and is not inextricably intertwined or otherwise controlled by the townships." Id. at 579. The court then went on to mention three points. First, it stressed that private, non-profit corporations can be considered "public offices." Id. Second, the court found that the fire-fighting corporation was a public office under R.C. 149.011 because it was a "public institution." In this regard, the court commented that "an entity organized for rendering service to residents of the community and supported by public taxation is a public institution." Id., citing Fox, 39 Ohio St.3d 108, 110, and Halaby, 162 Ohio St. 290, 298.
The court's third point in Freedom Communications was that the fire-fighting corporation performed duties that were historic governmental functions. 82 Ohio St.3d at 580. Accordingly, the court found, as we said, that the corporation was a public office under the Public Records Act. All the justices concurred in the per curiam opinion, except Lundberg Stratton, who concurred only in the judgment. Id. at 581.
In the present case, the trial court stated that it would apply the test from Freedom Communications. The court then found that MVCDC was a public institution because it rendered service to the community and was supported by public taxation. Although the court also concluded that providing Head Start services was not a function of government, it did not deem this fact relevant. Instead, the court interpreted Freedom Communications as requiring only two factors: service to the community and public tax support.
MVCDC contends that it does not fit within the definition of public office for several reasons. First, MVCDC is a private, non-profit entity, does not perform a historic governmental function, and has no duty to provide services for the benefit of preschool children. In addition, MVCDC claims that its functions are not inextricably intertwined with functions performed by public agencies, and that the state does not exercise substantial day to day control over its activities. Finally, MVCDC says that it is not supported by significant state taxation.
Although the cases from the Ohio Supreme Court are not completely consistent, we conclude that the trial court properly classified MVCDC as a public office. As a preliminary point, we note that a particular corporation's status as private and non-profit has no impact on the analysis. In fact, this was the initial observation made in Freedom Communications. 82 Ohio St.3d at 579.
Further, in Freedom Communications, the court impliedly rejected the significance of intertwined functions and government control, i.e., the court said that the absence of these factors does not prevent an entity from being classified as a public office. Id. Consequently, a lack of intertwined functions and government control over MVCDC would not prevent a finding that it is a public institution.
Similarly, the issue of whether MVCDC had a duty to provide services for children is irrelevant. Justice Moyer did point out in his dissent in Wertheim that the ombudsman office had no duty to investigate any complaint and could refuse to serve anyone. 80 Ohio St.3d 155, 159
(Moyer, dissenting). This was one of several factors Justice Moyer relied on in finding that the ombudsman office was not public. However, this was not the majority's holding and would not affect our analysis. In any event, we note that MVCDC's sole reason for existing and receiving funding is to provide services to children and their families. In fact, like all Head Start agencies, MVCDC must meet certain performance standards mandated by the federal government. Ohio also adheres to the federal performance standards. If an agency fails to meet these standards, its grant may be withdrawn. See Section 9836(a), Title 42, U.S. Code. As a result, MVCDC does have a duty to provide services, at least if it intends to stay in business.
The final factor mentioned by MVCDC is that it is not supported by significant state taxation. According to the record, MVCDC receives 95% of its Head Start revenue from the federal and state governments. Of that 95%, about 65% comes from the federal government and 35% comes from the state. The trial court found that the State of Ohio was not a significant contributor to MVCDC because District 925 did not show that MVCDC would have to close its doors without state funding. However, the trial court did find that MVCDC was supported by public taxation since it received funds from both the federal and state governments.
In reviewing the "public taxation" aspect of the test, we note that the Ohio Supreme Court has not relied on any particular percentage of funding that must come from taxation. For example, in Fostoria, funding from the city was in the form of an unspecified amount of waived rent and the purchase of some equipment. 40 Ohio St.3d at 10. The court did say that rent "is a major expense for any commercial endeavor." Id. at 12. While this might lead one to conclude that public support must be major, the fact is that many other expenses are incurred in operating a large entity like a hospital. In any event, other than making this comment, the court did not quantify how "major" public support must be. In our opinion, if the State funds 35% of 95% of the budget (or about 33% of the total budget) of an entity, the State is providing major support.
Toledo Blade also did not discuss a specific amount or percentage of direct or indirect tax support. However, the amount was probably not significant, i.e., the foundation was funded mainly through donations and bequests, which generally arise from the private sector, not from government funds. 65 Ohio St.3d at 258.
Finally, Freedom Communications did mention a specific percentage of public funding (about 97%), but the court did not say that such a percentage, or indeed, any particular percentage at all, is required for a finding that an entity receives public support. Accordingly, MVCDC is incorrect in contending that "significant" tax funding is required. What is necessary is that the entity in question receives support, directly or indirectly, from public taxation. Admittedly, a situation may arise in which the amount is too minuscule to be considered support. However, this is not such a case.
As we noted earlier, the last factor discussed in Freedom Communications was that the fire-fighting corporation fulfilled a historical government function. 82 Ohio St.3d at 580. Following this line of reasoning, MVCDC says it is not a public institution because government historically does not provide preschool services.
Both the magistrate and trial court found that MVCDC did not perform a government function. From this, they drew different conclusions. The magistrate interpreted the lack of government function to mean that MVCDC was not subject to the Public Records Act. In contrast, the trial court found that the failure to perform a government function was essentially irrelevant.
Although the Ohio Supreme Court has mentioned the term "historic government function," it has not specifically adopted this as a requirement. Instead, the two features that have been consistently used are: 1) rendering public service to the community; and 2) being supported by public taxation. These are also the only two factors explicitly mentioned by the syllabus. Fox, 39 Ohio St.3d 108, paragraph one of the syllabus. Nonetheless, most cases have focused to some extent on the presence of a "function" of government.
Again, the cases are not completely consistent. In some situations, the court has focused on the fact that the activity in question was either a traditional government function or was a function previously performed by a government agency. For example, when Fox was decided, Ohio law classified the operation of hospitals as a proprietary function. Because of this fact, the respondents in Fox argued that the hospital could not be performing a governmental function for purposes of R.C.149.011(A). 39 Ohio St.3d at 110. The court rejected this point, however, by focusing on the wording of the statute. Specifically, the statute read "any function of government," not "governmental functions." Id. As a result, the court stated that "[a] public office is any entity that exercises any function of government." Id.
In Fostoria, the government built the public hospital and operated it for many years. 40 Ohio St.3d at 10. Therefore, the private entity assumed a function that the government had previously performed. Similarly, in Toledo Blade, the fund-raising foundation assumed a former government activity and was not fulfilling what one might consider a traditional government function. Instead, fund-raising was simply an activity the University undertook to help support its work. Although the Ohio Supreme Court characterized fund-raising as an "indispensable function of any institution of higher learning," 65 Ohio St.3d at 262, the same could be said of any entity, governmental or not, that relies on private contributions to support its programs.
In Wertheim, the connection became more attenuated, because the government did not previously operate the entity in question, i.e. an ombudsman's office, or at least the case does not indicate that the office had ever been operated by a government agency. In this situation, the court relied on the public service and public taxation aspects, and the fact that the office's activities were inextricably intertwined with functions performed by government agencies.80 Ohio St.3d at 156-57. Specifically, the majority opinion in Wertheim remarked that:
 [t]he Ombudsman Office is unquestionably a publicly funded agency that acts as an intermediary between the citizens and government of Cuyahoga County. The activities of the Ombudsman Office are inextricably intertwined with the functions performed by Cuyahoga County government agencies.
80 Ohio St.3d 155, 157. However, as we said earlier, the Ohio Supreme Court later rejected the idea that an agency's activities must be intertwined with those of government agencies. Freedom Communications,82 Ohio St.3d at 579. This may have been due to the fact that the corporation in Freedom Communications performed an obvious historic government function, i.e., fire-fighting.
After reviewing the case law, one might conclude that some government connection must exist for an entity to be considered a public institution. This requirement could be satisfied in one of three ways. The agency could: 1) assume a function that a government agency has performed in the past; 2) perform activities that are intertwined with those of a government agency; or 3) perform a function that is historically considered governmental. If an agency meets any one of these three requirements, it is a "public institution," and is, therefore, a "public office," within the meaning of R.C. 149.43.
Assuming for the sake of argument that some government connection is required, we disagree with the findings of the trial court and magistrate on this point. Specifically, we believe that Head Start grantees perform a function of government when they provide preschool services to children and their families. We base this conclusion on several facts. First of all, educating the public is "a fundamental function of the state government." DeRolph v. State (1997), 78 Ohio St.3d 193, 249-50. See also, e.g., Section 2, Article VI of the Ohio Constitution (requiring the General Assembly to provide a thorough and efficient system of common schools), and R.C. 3301.13 (indicating the department of education is "subject to all provisions of law pertaining to departments, offices, or institutions established for the exercise of any function of the state government").
As an additional matter, while state-provided education did not traditionally involve preschool children, that is no longer the case. For example, R.C. 3323.02 states that the purpose of R.C. Chap. 3323 is "to assure that all handicapped children three to twenty-one years of age in this state shall be provided with an appropriate public education." Similarly, since March 17, 1989, school districts have been permitted to establish and operate preschool programs. R.C. 3313.646. By statute, boards of education may operate preschool programs themselves or may contract with Head Start grantees and other authorized providers. R.C. 3113.646(C).
R.C. 3301.52 through 3301.59 outline various requirements for preschool programs, including minimum standards and building requirements. The uncodified law accompanying R.C. 3301.52 refers to "Public Preschool," and makes the following comments:
 (A) The foregoing appropriation item 200-408, Public Preschool, shall be used by the Department of Education to award grants to school districts to pay the costs, which may include the costs of associated transportation and extended day-care services, of preschool programs for three-and four-year-old children. "School district" means a city, local, joint vocational, or exempted village school district eligible to receive funds under division (B) of section 3317.023 of the Revised Code or a county district providing services to such a district.
 Each district shall use the funds to provide a comprehensive developmentally appropriate preschool program based on the unique needs of district families. The Department shall ensure that each funded program includes at least the following program components: early screening, health, nutrition, and social services; home visits; parent-child activities; play and learning activities; and provision of information on other community resources for families and young children. These program components may be included in any appropriate manner, but the Department shall deem them to be sufficiently provided if a district elects to comply with Head Start performance standards described in 45 C.F.R. § 1304.
Ohio Adm. Code 3301-69-09 also provides for continuation and expansion grants to help eligible school districts pay for the cost of preschool programs. These grants may be used for collaborative and/or contractual arrangements with Head Start agencies or other licensed programs and service providers. Ohio Adm. Code 3301-69-09 (H)(4)(c). Further, all fund recipients must make annual reports and other reports required by the department of education. They must also let the department access their records to verify the use of funds. Ohio Adm. Code 3301-69-09(L) and (M).
Under the circumstances, preschool education of eligible disadvantaged children has become a function of state government. Because Head Start grantees either assume this function for school districts or are intertwined with the district through collaborations, they are performing a function of government for purposes of R.C. 149.011. Consequently, even if the case law requires a government connection, such a relationship does exist.
Although the trial court incorrectly held that MVCDC did not perform a function of government, the court did reach the correct result, i.e., that MVCDC is subject to the Public Records Act. Accordingly, the first assignment of error is overruled.
 II
In the second assignment of error, MVCDC claims that even if it is a public institution, the names and addresses of its employees should not be disclosed. MVCDC's first argument against disclosure is that the names and addresses of its employees do not fit the statutory definition of records in R.C. 149.011(G). This statute defines "records," in pertinent part, as "any document * * * which serves to document the organization, functions, policies, decisions, procedures, operations, or other activities of the office." According to MVCDC, disclosing employee names and addresses would shed no light on the matters outlined in the statute. In this regard, MVCDC relies on federal cases involving exemptions under the Freedom of Information Act, Section 552, Title 5, U.S. Code. MVCDC also relies on State ex rel. McCleary v. Roberts (2000), 88 Ohio St.3d 365, 372, which is a case involving the release of information about children who used a city's swimming pool and recreational facilities. District 925 has responded by citing various Ohio cases in which names and addresses have been ordered to be released.
For many years, Ohio courts have allowed release of names and even home addresses under the Public Records Act. See State ex rel. Public Emp. Retirees, Inc. v. Public Emp. Retirement System (1979), 60 Ohio St.2d 93,95-96 (ordering disclosure of names and home addresses of retirees); Police Fire Retirees of Ohio, Inc. v. Police Firemen's Disability 
Pension Fund (1985), 18 Ohio St.3d 231, 232-33 (ordering disclosure of names and home addresses of pension fund members); and State ex rel. Natl. Broadcasting Co. v. Cleveland (1992), 82 Ohio App.3d 202, 212-13
(ordering disclosure of police officer's home address). In fact, in State ex. rel Public Emp. Retirees, Inc., the court described the disclosure of names and addresses as only a "slight invasion of privacy" when weighed against the need of the relator to know the retiree's home address. 60 Ohio St.2d at 96.
Recently, the Ohio Supreme Court has taken a more restrictive view, at least in certain situations. For example, in State ex rel. Keller v. Cox (1999), 85 Ohio St.3d 279, the court held that files containing the names and home addresses of police officers, as well as other personal information, should not be disclosed. Id. at 282. In reaching this decision, the court relied on the constitutional right to privacy as well as a "good sense" rule to be applied when a criminal defendant seeks information about a police officer. Id.
Similarly, in McCleary, the court refused to order the release of information in the files of a city's parks and recreation department. The relators had asked for a copy of the electronic database, which contained various information about children who patronized the city's recreational facilities. This information included the children's names, home addresses, family information, emergency contact information, and medical history. 88 Ohio St.3d at 365. In rejecting the request, the court first found that the information was not a "record" under the Public Records Act because it did nothing to document any activity of the parks department. Instead, it was simply information about private citizens that the government happened to be storing. Id. at 368.
The court also found that even if the information were considered a "record," it would be exempt under R.C. 149.43(q), which excuses disclosure of any record, "`the release of which is prohibited by state or federal law.'" Id. In this regard, the court concluded that the release of such information would violate the children's right to privacy and subject them to the risk of irreparable harm. Id. Specifically, the court commented that "[b]ecause of the inherent vulnerability of children, release of personal information of this nature creates an unacceptable risk that a child could be victimized." Id. at 372.
Based on the privacy exemption, the Ohio Supreme Court has also refused to allow disclosure of employee social security numbers. State ex rel. Beacon Journal Publishing Co. v. Akron (1994), 70 Ohio St.3d 605, 607. The court has additionally ordered disclosure of employees' names and work addresses, with emphasis on the fact that only the work address was being requested. State ex rel. Thomas v. Ohio State Univ. (1994),71 Ohio St.3d 245, 247. Further, the court remarked in Thomas that "[n]ames and work addresses do not appear to implicate the constitutional right of privacy." Id. at 248.
Notably, in another recent case, the Ohio Supreme Court did allow disclosure of employee names and home addresses. See State ex rel. District 1199, Health Care and Social Serv. Union, SEIU, AFL-CIO v. Lawrence Cty. Gen. Hosp. (1998), 83 Ohio St.3d 351. In that case, a labor union asked a hospital to reveal various information, including employee names, addresses, and job classifications. Id. at 352. After the hospital denied access to the records, the union filed a petition for writ of mandamus. In reviewing the matter, the Ohio Supreme Court first found, consistent with the Fox and Fostoria cases, that the hospital was a public office for purposes of R.C. 149.011(A) and R.C. 149.43. Id. at 353. The court then ordered the records to be disclosed. Id. at 354. The court did not discuss privacy concerns, nor did it comment on its prior decisions. On the other hand, the court did remark on the fact that the hospital had not asserted the applicability of any exemption from disclosure. Id.
One way of reconciling these seemingly inconsistent decisions is to limit McCreary and Keller to their facts. Since both cases involved situations where the right to privacy is particularly important (police officers and children), we could conclude that home addresses may be released unless the objecting party presents some compelling reason why disclosure would be harmful. However, we do not need to decide this point.
Recently, the Ninth District refused to order release of the home addresses of the employees of a children services board. State ex rel Jones v. Summit Cty. Child. Ser. Bd. (Jan. 24, 2001), Summit App. No. 19915, unreported, 2001 WL 96048, p. 4. Citing both McCleary and Keller, the Ninth District Court of Appeals found that the home addresses were not "public records" because they did not document the activities of the board, nor did they further public knowledge of the board's internal workings. Id. The Ninth District did not discuss any potential privacy concerns.
Upon consideration, we agree with the Ninth District. Certain employee information might be pertinent to an entity's activities or inner workings. However, we see no possible relevance of the employees' home addresses. Therefore, we agree with MVCDC that the home addresses of employees are not "records," as defined by the statute. In view of this conclusion, we do not need to discuss MVCDC's remaining arguments about rights to privacy and equal protection. We note that the trial court did not address these matters.
Based on the above analysis, the second assignment of error is sustained in part and is overruled in part. As an aside, we observe that no serious dispute exists about why the union wants the names and addresses of employees. However, if the union wishes to contact employees, it can do so at their work addresses.
In view of the preceding discussion, the trial court judgment is affirmed in part, and is reversed in part and modified as follows: MVCDC is ordered to disclose the names and work addresses of its employees. In all other respects, the judgment is affirmed.
FAIN, J., concurs.